May it please the court, my name is Kenneth Plazon and I represent Mr. Brian Allen as relator for the United States government as well under a Quintam action that he had filed along with a 42-1983 action. Now the threshold issue in this case is whether appointing counsel under the 6th and the 14th amendment applies in a civil contempt proceeding where the underlying child support payment resembles a debt-collecting proceeding owed to the state by the indigent obligor. The facts are in this situation. Did your client appeal the civil contempt findings up through the state? No he did not. We come to the lower court for the rights that his rights were violated underneath the 6th and the 14th amendment. By whom? By the court and by the district attorney's office. You wanted the district attorney's office to select counsel for him? Well they're part of the government. Do you have any cases ever holding a prosecutor's office responsible for a failure to appoint counsel? It seems to me there might even be a conflict if they were to do so, but have any cases recognized that's the responsibility of a prosecutor? Well there are offices of the court and they are underneath the Louisiana constitution. They owe a duty to protect its citizens and so forth. I don't have any case law to suggest that, but there is a right to counsel underneath the 14th amendment in terms of the Turner case. The Turner case suggests that they have to have notice of the defendant to have the ability to pay. Well, Turner though was an appeal in the state court system of the civil contempt finding, and that's how just about all the right to counsel cases, whether they're 6th amendment or here, not a criminal case under the 14th amendment or abroad. It just seems difficult to bring this to the 1983 action after the fact. You also sued the judge. How do you get around the immunity problems that the judge . . . Well, under the Quintam action and also 1983 action, if the federal government is a party to the suit, it is Mr. Allen's contention that there is no immunity because they are plaintiff, party plaintiff to the suit. We cite several cases to that effect. On the Quintam, but not on the 1983, your client's the sole plaintiff. The United States isn't a party to a 1983 claim. That is correct. The counsel issue relates to the . . . is the 1983 claim. How do you get around immunity on that with the judge? We honestly believe that, again, the judge is to protect its citizens underneath the Louisiana Constitution, and we think that they have a duty to do that. We think that it falls underneath the 1983 action and also in conjunction with the false claims act. That's your answer on the district attorney's office and as to Judge Keller? Judge Keller and the state of Louisiana as well. What is it, DCAF? Department of Children's. All of them have a duty, I see. What about Ms. Howard?  We'll start with the right to counsel on the 1983 action. I don't have that. I don't think that Ms. Howard is a governmental entity, but she is a . . . in the 1980, I think it's 42 U.S., 1985, in terms of conspiracy and so forth, that's what we put her under, conspiring to violate Mr. Allen's constitutional rights. Most of the briefs seem to identify the injury as one that occurred in California, where your client's allegations are there was a false affidavit that led to a paternity test that exonerated him but was suppressed? Is that the theory? It was actually suppressed. Mr. Allen, if you check out his CV and his resume, he is a scientist in DNA sequencing, so Mr. Allen is almost an expert in this area. Mr. Allen subpoenaed the DNA test from LabCorp, and it came back with bad information, scratch that. Forensic use only, and also for forensic use only, and . . . Who ordered the paternity test? The state of Louisiana, Jefferson Parish, it's my understanding, Jefferson Parish . . . I thought it all happened in California, and then the proceedings were . . . later happened here when he was held in contempt.  I think that the initiating state, which is the state of Louisiana, and the issuing tribunal is the Jefferson Parish court, that's my understanding, and then they send the subpoena to California under UIFSA, I think, and then they send that subpoena to Mr. Allen's job in California. And under UIFSA, the law of the responding state, which is California, would apply to that paternity test. Isn't that the case? I don't think so. I think that if they do an order for child support, but the order for paternity test comes from the state of Louisiana, that's my understanding. What in the record can show us that? Is there anything? That the Louisiana procedures were followed as opposed to California procedures? It is Mr. Allen's assertion that it initiated from the state of Louisiana, and so I think that the laws of the state of Louisiana apply to the paternity issue. There's something in the record that says Allen requested a notice to be sent by Alameda County, which is Oakland, I guess, notifying Howard and her child to appear for paternity testing. Do you know anything about Allen actually wanting the paternity test? Is that a different test? I'm having difficulty pinpointing in the record which test we're talking about and who ordered it. Well, I think that the state of Louisiana ordered it because Ms. Allen and the child is from Louisiana, and they initiated the DNA test and, I guess, blood test and what have you here in the state of Louisiana, and then they went after Allen to get his DNA test or DNA. This is record 716. It looks like Allen requested it. Do you have any sites to the record where it would help us figure this out? I don't have the record in front of me, Judge. I guess we can try to supply it at a later time, but it's my understanding that this is the initiated state. They asked for Mr. Allen to give his DNA in the state of California, but Ms. Howard gave his DNA here, I think, in the state of Louisiana. That's my understanding of it. His position at each of the proceedings in Louisiana, each of these sentencing proceedings where you say he lacked counsel but was entitled to counsel, his first position has been, I'm not the father of the child? That is correct. That's always been his consistent position? Consistent position. Now, Ms. Howard suggests that he did acknowledge the kid, but Mr. Allen says, no, that's not the case. He isn't disputing he has an ability to pay? He's disputing that it's a child he should be paying for it all? That is correct. Be careful. That's a compound question I just asked you. He is not disputing he has always had an ability to pay. His position is that he shouldn't be required to pay for this child? Not always. When he was in California, he had the ability to pay, and he did pay when he had a job. Okay. Why would he have paid in California if his position is that it's not his child? Because the order suggested the child support . . . The California order? The California order stated that he had to pay child support because . . . Okay. Where in the record is there a California order indicating that he's got to pay because they determined it was his child, and he, as you say, had an ability to pay there? I don't remember that in the briefs. It should be in the record, Judge. Again, we can supply that judgment. It should be in immediate accounting. Okay. But ever since he returned to Louisiana, he's had no ability to pay? Is that your position? That is correct. That is correct. Always ability to pay there, never ability to pay here? Well, Mr. Allen suggests and he says that he was constructively discharged in the state of California. He worked for a division of Johnson & Johnson. When they subpoenaed him and presented a summons, he had to tell his boss and so forth. He also was involved in . . . He does validation at Johnson & Johnson, validating tests. That was his major argument with LabCorp, is that they did not validate the test. They gave raw data to him, but they didn't validate it, and that's his expertise. They picked on . . . Not the average Joe, they picked on someone that had DNA experience, sequencing and so forth and so on. What we're saying is that the paternity issue should have been allowed to . . . The lower court should have allowed more information and also to discover, because we did ask for a right to trial by jury under the Seventh Amendment and under Rule 38, and that's the ultimate procedural, I think, primary source of law, and everything else has to abide by that. That's my opinion. I love the Seventh Amendment, of course. Anything in terms of a motion to dismiss when we have evidence to the fact that he was incarcerated underneath criminal statutes. We have evidence, because Mr. Allen filed a motion for summary judgment, and he attached documentation to the fact that he was incarcerated under Louisiana 1474 and 75 and in criminal contempt. In that situation, the Sixth Amendment comes in and says, hey, he has a right to trial by jury, and he has a right to counsel, but let's say that my opponent is correct, and those forms that we submitted to the court, of course, is demonstrative evidence, is direct evidence, and by preponderance of the evidence, we proved our case in that motion for summary judgment. The lower court erred, I think, in not allowing a summary judgment to go forward, and my opponents never did answer the summary judgment. I was doing a lot of discrimination cases about ten years ago in federal court. When the defendant files a motion for summary judgment, I better have my motion, my memorandum, my affidavit, and also . . . Just because your time is running out, I wanted to give you a chance to address the Ketam claim. It's one of the ones you emphasized when you started, and I guess your theory has a few links in the chain, but at the end of the day, it's saying that by putting your client into custody for not paying the child support, that that results in Louisiana filing a false claim with the federal government for child support collection programs and housing of inmates. Did you have any allegation that your client's incarceration increased those amounts? In other words, are they just generally Louisiana or this parish is getting a certain amount each year for child support, or is it somehow tied to the number of people incarcerated, which would surprise me if it's tied to that? We wasn't allowed to do discredit. We had a jury . . . Especially for a fraud claim, Rule 9, you've got to allege with particularity the nature of the claim. The court dismissed everything under the 12B6 motion, and we . . . It's a pleading standard for false claims. You've got to have that information with particularity before discovery when you plead. You didn't have anything in your complaint that suggested there was a marginal additional amount provided to the public entities because of your client's incarceration. Well, the state of Louisiana and the state of California is under Title 4D. It's an agency that collects money from . . . I have no doubt they get billions of dollars from the feds, but I guess the question is, did incarcerating your client increase that amount at all? I couldn't answer that question. I don't know. Again, we can provide it if we had discovery, if we could have went forward with discovery. We wanted to take Mr. Allen's deposition and everybody's deposition and request permission of facts, request of production of documents, and so forth. That's what we want. Mr. Allen desires, I guess, a judgment in his favor, and if that is not what this court can do, then to remand it back to the lower court so we can have a trial by jury and have discovery. Thank you. Good afternoon, Your Honors. May it please the Court, my name is Douglas Swenson, and I'm here on behalf of Judge Ann Keller. I think it's very important to note and start off looking at the factual allegations that were made against Judge Keller. They're found in . . . particularly, there were only two sentences regarding any factual allegations, and Judge Costa, I think you hit on it perfectly regarding any allegations of fraud. Paragraph 34 and 35 basically state, the judge failed to take into consideration any evidence to disprove paternity, held the defendant in contempt, and then made the conclusory allegations that it was done under color of state law and that it was unconstitutional. The next two paragraphs simply state that money damages were owed by Judge Keller in her official and individual capacity under 1983 and under 1985. Those are the only allegations that there are. So it fails the fraud . . . the particularity for fraud. It also . . . I agree. Clearly, the claims for damages, I think the judge has immunity for. Any claim for injunctive relief against the judge, the Federal Courts Improvement Act, I think, arguably precludes, but what about declaratory relief? There are some situations in which you can get declaratory relief against a judge, and why wouldn't this be one of those instances if she is the judge who's been presiding over all these proceedings? And this is, I guess, part of my question. Is she going to be presiding over subsequent violations? What about declaratory relief, just to make clear whether or not we conclude that he should have the right to counsel or should have it going forward? Well, I think in that case, Your Honor, what you're looking at is you're looking back at the Turner case, where the court . . . he appeals that, and it's actually made an appellate record that goes to the court, and that can be determined at that point, and declaratory relief can be awarded after that goes through that procedure. If that's the case, though, I would argue that this court should abstain from the action under either Younger v. Harris or Rooker-Feldman, allowing the court to proceed with those arguments. And it's never been addressed by the higher courts in Louisiana, this issue, in his case? No. That's . . . it wasn't alleged that in the petition, and this was dismissed on a 12-v-6, and I believe counsel just submitted to the court that there was no appeal and this hasn't been developed. Will the same judge . . . let's say he's found in violation in the next couple of months and has to go back for another contempt proceeding. Is it going to be assigned to the same judge? Possibly, Your Honor. It could be . . . if my understanding is correct from the record that's been developed here on the summary judgment, it actually goes to a judicial hearing officer. Would it go back to the same judge if it's allotted to the same division? I would surmise that it probably would, so you do have that issue, but I think the counsel for . . . my co-counsel has actually developed the record a lot better and can answer that question a lot better regarding who it would go to and the Turner factors that I think you're . . . we're kind of getting into here. And in that regard, Your Honors, I think my time is up. I just ask that the judgment be affirmed as to Judge Keller. Thank you. Good afternoon. Phyllis Glazer on behalf of the State of Louisiana Department of Children and Family Services. The first thing that I need to mention is that the United States declined to intervene in this case, and thus there are two cases directly on point one on each of the two claims lodged against the state. The Virginia Agency of Natural Resources v. Stewart says the state's not a person that can be sued under the False Claims Act if the United States declines to intervene. And Will v. Michigan, which is a well-established authority, says the state cannot be sued under 1983. The state's not a person. And the dismissal of the state was entirely proper under Rule 12b-6. And I should just note that counsel for the DA told me . . . since I have a minute . . . counsel for the DA just told me that Judge Keller is no longer presiding over any of Mr. Allen's cases in the future. Do I have any other questions? Good afternoon, Your Honors. Terry Boudreaux on behalf of the Jefferson Parish District Attorney's Office. Maybe just as briefly as my colleagues, Your Honors, appellant's attorney claims the main issue before the Court is the . . . whether or not he had a right to counsel at the contempt proceedings. And I submit under the Supreme Court case, Turner v. Rogers, the factors that they list there. It was clearly a civil contempt proceeding. Judge Barbier deferred an initial ruling on that claim to get more evidence. Was there an evidence you're hearing also after you got evidence? I don't think . . . I don't know, Your Honor. I know there are documents. It's my understanding from the attorneys who were handling the case originally that Judge Barbier asked for evidence and documents were submitted. They're in the record indicating that . . . But there is . . . if you go down the Turner factors, there is asymmetry. The state . . . Asymmetry in what? Asymmetry in terms of Ms. Howard all . . . well, Ms. Howard several times, but the state always had a counsel. Yes, Your Honor. At these proceedings in juvenile court, the assistant district attorney assigned to this program would be present. I believe the court would have gotten a letter I think last week I sent in correcting what I noticed to be a mistake in our brief that at five proceedings in juvenile court, Ms. Howard did have her own private counsel in attendance. But that's a significant factor under Turner. That is a factor, yes, Your Honor. Is there any court that doesn't say that's a decisive factor? I'm not aware, Judge, if a court says it's decisive or not. I don't think it is. They list several factors. I think on two occasions, Mr. Allen had counsel present in the juvenile court proceedings. But I think there's no question that it's a civil proceeding. Obviously, he was not prosecuted under the revised statute of Title 14 in Louisiana. I'm just accepting that it's a civil contempt proceeding. The whole point of Turner, which was controversial, there was a strong dissent, is that you do have a 14th Amendment right in certain circumstances in a civil contempt child support proceeding. In certain circumstances, Your Honor, and they list some factors. One of the factors is whether the custodial parent, the mother, had her own attorney. The juvenile court record before this court now, I believe it shows on five instances, she did have an attorney. Has the court system here done anything to consider how Turner applies to its procedures in these? Yes, Your Honor. And if I can put my hands on some of the documents that are in this court's record, Judge Barbier noted that it appears that in Jefferson Parish, even before Turner came out, some of these factors were being in place. He was given notice. Every minute that treat appears that I've looked over, he testified. Mr. Allen testified, so he was given the opportunity to present whatever testimony he felt was relevant to the situation. So that factor weighs against that he needed counsel, because the Supreme Court said it's not automatically. First of all, he has to be indigent. Mr. Allen's not indigent. The court has before it documentation, which Judge Barbier asked for, I guess, in light of those factors. But there's no procedure to request or any criteria for appointed counsel in these cases in Jefferson Parish? To appoint counsel, Your Honor? All right. If someone walks into one of these and says, look, she's got an attorney, I don't, I just read Turner v. Rogers, I think I have a right to an attorney, you know, obviously in criminal courts, there's procedures you go about, you fill out an affidavit of indigency. There's no procedures, there's no list of attorneys who would be provided. I mean, it's just not a possibility in Jefferson Parish. I wouldn't say it's not a possibility, Your Honor. I don't work and I never have worked in the juvenile division where this is done, so I'm not really sure. Because my law before Turner was you have to give counsel, the Ridgway decision. So it's ironic that I think as of Turner 2011, states have less obligation. But it would seem to me, you can correct me if I'm wrong, that up until Turner, Fifth . . . Do you agree or you don't know? I have to say I don't know. What goes on it appears. I know one of the minute entries documents that the public defender's office was called, someone was sent over. And the minute entry reflects that they, they're told they're not authorized to represent the, usually in this case, the father in this type of proceeding. But that creates the imbalance that the Supreme Court was out for. Well, it would be one of the factors weighing. You, it's a very significant factor is whether he had an ability to pay. And the representation in the brief is he was always found to be able to make payments but unwilling to do so. But there wasn't a record support for that. Well, yes, Your Honor. And I would refer it to the court. And I think that's some of the things from what I'm told Judge Barbier was interested in. At the record of 780, 81, and 82, there were the forms that the Supreme Court spoke of that was submitted by Mr. Allen to the court reflecting his employment and his income. So actual employment, actual income, no hypothetical he should be able to work and make money. Another factor in turn of your Rogers, Your Honor, is a court, finding by the court that he is able to work. But on these occasions, you think the record reflects that there were actual conclusions  Yes, Your Honor. And on that, the form requesting information the Supreme Court spoke of in Turner is at 780, 781, and 782 in the record. And if I can have just a moment. Obviously, I mean, there are considerable procedural threshold difficulties to this case. Mr. Allen submitted 13 pages of a statement of a case. Neither of the appellee briefs offer any statement of the case. So it was very hard for me to go back and figure out what happened procedurally or factually. Any reason why there was no statement of the case given to us? I can't say, Your Honor, I did not write a brief. Because on the rules, our rules, you as appellee can choose to accept if you accept his statement of the case. But I'm doubting that you accept propositions of his like that he's not the father. That's correct, Your Honor. Okay. I can't answer the question. I did not write a brief. Why it's not there. But perhaps it's because the matter is here before the 12B6 motion was granted, the court below was looking at the pleadings, which this court would look at as a de novo review. If I may go back just a moment to what Your Honor was asking. The record here, where the court, in light of, I'm sure, the requirements of Turnaby Riders, made specific findings about the defendant was employed or underemployed or that there was no disability preventing him from seeking employment. And some of those are at 741, 764, 765, 770, 775, and 759. Specific findings by the juvenile court at these proceedings that the defendant had the ability to work. And his other documents I mentioned show that he is employed and on one occasion was found to be underemployed. So the factors of Turner, other than the having . . . On one occasion was found to be unemployed, right? I think so, Your Honor. Or I know underemployed. Underemployed. I think, yes. 764, he was found underemployed. What does that mean? That he's doing jobs deliberately to avoid . . . It could be what the court was considering. Some of the things I've seen in the record, Mr. Allen apparently has some, I don't know the extent, but education in the scientific field he was working on in Stanford Johnson and Johnson at a time making in a neighborhood of $70,000. And the documents in the record now show he's making, I think, $350 a week at Macy's, the department store. But the court, in compliance with . . . And Judge Barbier found, Jefferson Parish Juvenile Court is in compliance with the requirements of Turner. So putting aside or considering it however the court would . . . significant or not, no attorney would weigh against our contention. The other factors when you do a balance, substantial compliance, I would say, with the requirements of Turner. Do you have any guidance on the questions I was asking about the paternity testing and the Fourth Amendment issue about who wanted the testing? Because like I said, I see some indications that he did and where the testing took place. Yes, Your Honor. The case initiated in Jefferson Parish where the mother came to the juvenile court with the situation, we requested of California that testing be done. The testing was done in California and on page 717 of the record, Mr. Allen was found to be the father of the DNA tester. He was represented by counsel at that hearing in California. And so is it California procedures? Because he's bringing a Fourth Amendment claim, normally, it's a little bit odd, normally you wouldn't go after the DAs. Obviously, you'd go after the police officer who searches you. I mean, it's a little of a different circumstance, but, you know, I don't know who administered it. So is it California that actually issued the procedures that would follow that? Because I think he's trying to invalidate the Louisiana statute on paternity testing and if it wasn't what applied to his paternity test, that would . . . Right. However, it was done, it was done pursuant to California, I'm sure, statutory law in a judicial proceeding. This is not a typical criminal Fourth Amendment issue where you say the cops, you know, did something improper. You had judicial involvement here. So how is the DA's office here on the hook, if at all, for that? An initial order was entered by the California court. That order was sent to Jefferson Parish. Here's an order saying Mr. Allen's the father, he needs to pay support. California determined an amount, I think they adjusted it for the economics of Louisiana, and a petition was filed here to authorize or, the exact word, escape him, but to make it effective in Louisiana. We're enforcing a California court order. When a DA's office goes to court, I mean, to enforce something, a police officer, you know, you've decided to take a case of a police officer last year, search someone unconstitutionally at their house, you don't usually sue the DA's office, you'd sue the police officer. I mean, I don't understand why you're being held responsible for a California court order pursuant to California statutes to order paternity testing. I don't either, and I don't think we should. But I note that in the record, we filed at some point, and I believe in a supplemental brief in connection with our motion, and we cited Heck v. Humphrey, I would submit that to the court. I would also have to suggest, it's not in the brief anywhere, but Embler v. Packman, the normal prosecutorial immunity we have, I would submit both of those would be defenses to the claim in support of the district court's ruling granting the 12B6 motion. Your Honor, in further reply to your question about the Fourth Amendment issue, as it was in California, did you bring it to Judge Barbier's attention? I didn't see much in his opinion, and this is obviously a very difficult case, it's still confusing at this stage, but did you bring it to his attention that a California court ordered the paternity testing? Because I don't think I saw him mention that. I have to think he understood. I can't personally answer that, your Honor, of my own knowledge. I have to think he was. Part of the claim made was that the California proceedings were corrupt, they were influenced by perjury of the mother here, and an attempt to amend the complaint later, which was denied, was to bring in the, I think the New York company, LabCorp, I believe, that actually did the testing, that they're all part of the conspiracy. But interesting, in further to your question about the Fourth Amendment and the proceedings in California, your Honor, at page 716 of the record is a letter from the Department of State Support Services from California that Mr. Allen is requesting his wife be DNA tested. So, you know, sort of what's good for the goose is good for the gander. He wanted her tested, and in fact, I don't have it in front of me to cite it, but he filed an affidavit where he wanted the state to do more testing, so he's objecting to the original collection of evidence, but at the same time he's saying, give me a do-over. And I don't think that the, you know, I would refer to court at this point, I guess, to Judge Barbier's opinion about the Fourth Amendment, as I would to any of the issues he, I think, discussed fully in his two words. Do you know what, does the record contain a child support information sheet for each specific sentencing? I don't know, Your Honor. I can just refer the court to the three which was submitted to the district court, if I understand the question correctly, when Judge Barbier asked for some more information. I guess the larger question is, how does Louisiana assess ability to pay? Is it always pursuant to the obliger or filling out one of these sheets? Again, I'm at a disadvantage to answer that question, Your Honor. I believe there's guidelines based upon income and number of children, as opposed to just, I know in the old days in domestic court, district court, judges would have the hearing and say, here's what you got to pay. Now there's more guidelines based on income and children, et cetera, and I think the juvenile court has a similar proceeding to come up with the number. The original number came from California, and it was adjusted downward, the lower cost of living in this area. Thank you. Thank you, Your Honors. That concludes today's arguments. Oh, yes, that's right, Roboto, excuse me. Thank you. With respect to paternity, there's a Lolly case versus Lolly at 439 U.S. 295, and they don't talk about paternity in the context of child support. They talk about paternity in terms of interstate succession. What issue is this? This is on paternity. With respect to, you start out with respect to what? A legitimate governmental interest to make sure that the paternity test is accurate, and that's what we want the court to decide as well, that what comes before, do we put the court before the house or whatever. What we're saying is that we have to be accurate with respect to the paternity test, more so than the child support situation because, let's face it, Mr. Allen was put in jail because the paternity test was invalid, but the judge said that he was the father of the kid. What we're saying is that . . . How can a federal court review . . . I don't know anything about this paternity test out in California, but how does a federal court have the authority to review the accuracy of a paternity test conducted out in California under a state court order? The paternity test was . . . the swab was gathered in California, was sent to New York for the testing, so we're saying that under, I guess the . . . Do you have any federal cases reviewing the accuracy of paternity test? No. We don't have . . . We have several cases from New York that . . . in a state court, but we just think that it should go back to the lower court, and we should be given discovery, and then at that point, do a motion for summary judgment, not a 12B6 motion because we're the judge's mind believability of the allegations. We had facts. It seems like if you're challenging the actual paternity ruling that he's the father, and that's a family law ruling of the state court, there's a whole doctrine called Rooker-Feldman that says we can't second-guess. Whether it's right or wrong, it's not our job to second-guess state court family law decisions. Well, that's why we came with the novel approach of coming with the False Claims Act, and we're saying that if LabCorp had submitted a false claim, had submitted a false affidavit, we're saying that that contractor that collects money, and they collect a couple of million a year on doing these paternity tests, and if it's inaccurate, if it is inaccurate, then that's a false claim, and so we wanted more information. We wanted discovery. We wanted to go that whole process, and we wasn't allowed to do that because of the 12B6 motions. When we filed that motion for summary judgment, we listed everything. We put everything in context in terms of demonstrative evidence, direct evidence, by preponderance of the evidence. We won that case because my opponents never answered their or did a memorandum in opposition. Now, the court said, well, that's moot. The lower court said that, well, you don't have to do that, but I would have done it anyway because I always got, when I did discrimination cases, they really stuck it to me, but nevertheless, so of course we want a judgment in favor of Mr. Allen, and if we can't get the judgment, we want it to be remanded back to the lower court for, I guess, proceedings, especially discovery. I think if we can get some discovery going, we'd be all right. Thank you. Thank you very much, and that concludes today's arguments. The court will be in recess until tomorrow at 9 a.m.